AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>Samsung cellular phone, unknown model with serial<br>number 359276661256548 | Case No. 21-400MB<br><br>(Filed Under Seal) |

## APPLICATION FOR A SEARCH WARRANT

SEALED

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following cell phones:

### As further described in Attachment A

located in the District of Arizona, there is now concealed:

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with Intent to Distribute Controlled Substance |
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute Controlled Substance |
| 21 U.S.C. § 856 | Maintaining Drug-Involved Premises |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Offense |

The application is based on these facts:

### See attached Affidavit of Special Agent Daniel Kolodziej

☒ Continued on the attached sheet.
☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Ryan McCarthy

RYAN
MCCARTHY
Digitally signed by RYAN
MCCARTHY
Date: 2021.12.16
09:26:30 -07'00'

_____
*Applicant's Signature*

Special Agent Daniel Kolodziej, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _12-16-2021_

_____
*Judge's signature*

City and state: Phoenix, Arizona

Honorable Michelle H. Burns, U.S. Magistrate Judge
*Printed name and title*







# ATTACHMENT A

*Property to be searched*

The property to be searched is a Samsung cellular phone, unknown model with serial number 359276661256548, (hereafter the "SUBJECT CELLULAR TELEPHONE") The SUBJECT CELLULAR TELEPHONE is currently in storage at ATF evidence vault located at 40 N Central Avenue, Phoenix, AZ 85004

This warrant authorizes the forensic examination of the SUBJECT CELLULAR TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

*Property to be seized*

1.  Any records and information found within the digital contents of the SUBJECT CELLULAR TELEPHONE that relate to violations of 21 U.S.C. § 846, Conspiracy to Possess with Intent to Distribute a Controlled Substance, 21 U.S.C. § 841, Possession with Intent to Distribute a Controlled Substance, 18 U.S.C. § 924(c), Possession of a Firearm in Furtherance of a Drug Trafficking Offense, and 18 U.S.C. § 1956(a)(1), Money Laundering including:

  a.  all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of drugs;

  b.  all information related to buyers or sources of drugs (including names, addresses, telephone numbers, locations, or any other identifying information);

  c.  all bank records, checks, credit card bills, account information, or other financial records;

  d.  all information regarding the receipt, transfer, possession, transportation, or use of drug proceeds;

  e.  any information recording schedule or travel;

  f.  evidence indicating the cellular telephone user's state of mind as it relates to the crime under investigation;

  g.  contextual information necessary to understand the above evidence.

2.  Any records and information found within the digital contents of the SUBJECT CELLULAR TELEPHONE showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" includes records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone.

2

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, Daniel Kolodziej, being first duly sworn, hereby deposes and states as follows:

### I.   INTRODUCTION AND AGENT BACKGROUND

1.     Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to examine the following cellular telephones further described in Attachment A (hereafter "SUBJECT CELLULAR TELEPHONE"), and in order to extract the electronically stored information set forth in Attachment B, which represent evidence and/or instrumentalities of the criminal violations further described below.

2.     Your affiant is a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since March 2020. As a Special Agent with ATF, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, and Special Agent Basic Training for the ATF. As a Special Agent with the ATF, I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.   Prior to my employment with the ATF, I was employed by the Department of Homeland Security (DHS) where I worked as a Border Patrol Agent for one year. While at the DHS I received specialized training at FLETC in Artesia.  As a Border Patrol Agent I was empowered to enforce the immigration laws of the united states of America.  As a Border Patrol Agent I had regular dealings with tracking and apprehending illegal immigrants.  Prior to my time as a Border Patrol Agent I worked a police officer for the Towns of St. John (IN) and Dyer (IN) for eight years.  As a police officer I regularly enforced Indiana State Laws and conducted investigations into many different calls for service.  For the last five years of my career as a local police officer, I was assigned to the North West Regional SWAT Team as

an operator on Entry Team One. As a SWAT Operator I was tasked with serving many high risk arrest and search warrants. I have apprehended many dangerous criminals and responded to many barricaded situations with and without hostages.

3. Through my training and experience, I have become familiar with: 1) the manner in which controlled substances and firearms are imported, manufactured, distributed, and sold; 2) the activities of persons engaged in the importation, manufacture, distribution and sale of controlled substances and firearms; 3) the activities of persons engaged in the illegal possession and manufacturing, and distribution of firearms and ammunition; 4) the use of methods to avoid detention and apprehension by law enforcement officers. I have also become familiar with the manner in which proceeds from the sale of narcotics and firearms are hidden and transported, as well as the efforts persons engaged in the transportation and laundering of said illicit proceeds will make to avoid detection, apprehension, and seizure by law enforcement officers. I am also familiar with methods used by firearm and narcotic traffickers to hide, convert or otherwise conceal proceeds of such activities.

4. The statements contained in this Affidavit are based on information derived from your Affiant's personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; information provided by a confidential source; analysis of public records; controlled purchases of drugs; analysis of social media information; analysis of telephone records; intercepted communications; and analysis of financial records.

5. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

2

## II.   BASIS FOR PROBABLE CAUSE

### a.   Background on Investigation

6.      This is a joint proactive investigation between the ATF Miami, Homeland Security Investigations (HSI), the United States Postal Inspection Services (USPIS), the Miami Dade Police Department (MDPD), and the City of Miami Police Department (MPD). These agencies have identified violent Drug Trafficking Organization (DTO) responsible for the armed drug trafficking, firearm trafficking, robberies, armed home invasions, shootings and fraud throughout the northern end of Miami-Dade County.

7.      The present investigation began in 2019 and started to develop in earnest in approximately July 2020. With information provided by a Confidential Source (CS), law enforcement identified RODRIGUEZ-CHIRINO as a wholesale distributor of cocaine, heroin, methamphetamine and firearms in Arizona and Florida. Shortly after, law enforcement introduced an undercover agent (UC) to RODRIGUEZ-CHIRINO. After multiple UC meetings between the UC and RODRIGUEZ-CHIRINO, law enforcement identified multiple suppliers, distributors, and transporters in both Phoenix, Arizona and Miami, Florida area including: Marlon MORENO-ARRIETA, an Arizona source of supply (SOS), Jose DELTORO-GASTELLUM, an Arizona SOS, Francisco ALTAMIRANO-SERRANO, an Arizona SOS, Christopher COMSTOCK, an Arizona distributor, Julian SANTANA, an Arizona distributer, Jeffrey SHEA, an Arizona distributor, Octavio REYES, transporter and Antonio PEREZ, transporter.

8.      Throughout the investigation DELTORO-GASTELLUM has been identified as one of RODRIGUEZ-CHIRINO's SOS. This has been confirmed by the analysis of PRTT of DELTORO-GASTELLUM's known telephone number which shows the frequency of their communication. Between April 16, 2021 and November 16, 2021, the RODRIGUEZ-CHIRINO and DELTORO-GASTELLUM have had 2118 total communications.

9. On August 31, 2020, law enforcement coordinated a meeting between the UC and RODRIGUEZ-CHIRINO in the Phoenix, AZ area. During the meeting the UC discussed the prices of methamphetamine and heroin with RODRIGUEZ-CHIRINO. Subsequently, RODRIGUEZ-CHIRINO placed a phone call to his suspected supplier in the presence of the UC. RODRIGUEZ-CHIRINO activated the "speaker" function of his phone and the details of the conversation were heard by UC. The supplier detailed the availability of narcotics to sell to the UC. The UC was able to see the saved name of the contact on RODRIGUEZ-CHIRINO's phone was "Uriel MERICHO." Law enforcement later identified the individual on the phone as Marlon "Uriel" MORENO-ARRIETA.

10. On September 1, 2020, the UC met RODRIGUEZ-CHIRINO at his residence in Glendale, Arizona and conducted narcotics purchase for three (3) pounds of methamphetamine. During the meeting RODRIGUEZ-CHIRINO showed the UC a firearm and explained to the UC that he carried the firearm to protect himself. Additionally, during the meeting RODRIGUEZ-CHIRINO made multiple telephone calls to MORENO-ARRIETA to request an update on the promised heroin for the UC. At the conclusion of the meeting, RODRIGUEZ-CHIRINO advised the UC the heroin would be ready on the next day. On September 2, 2020, the UC met RODRIGUEZ-CHIRINO in the parking lot of his residence. RODRIGUEZ-CHIRINO sold 81 grams of heroin to the UC.

11. On March 25, 2021, the Honorable Darrin P. Gayles, U.S. District Court of South Florida, authorized the T-III intercept on four (4) telephone lines including RODRIGUEZ-CHIRINO, REYES and two (2) other Miami based distributors.

12. On March 29, 2021, the UC met with RODRIGUEZ-CHIRINO in the parking lot of his residence in Phoenix. The UC purchases two and half (2.5) pounds of methamphetamine and eleven (11) firearms. During the meeting, RODRIGUEZ-CHIRINO placed an outgoing call to MORENO-ARRIETA to discuss the UC's discontent

4

with one of the firearms. RODRIGUEZ-CHIRINO placed the telephone in speaker mode and the UC was able to speak with MORENO-ARRIETA.

13.    On April 23, 2021, the Honorable Darrin P. Gayles, United States District Court of South Florida, authorized the T-III wire intercept on five (5) telephone lines including one line for RODRIGUEZ-CHIRINO, MORENO-ARRIETA and two (2) other Miami based subjects. During this time, law enforcement was able to seize over six (6) pounds of methamphetamine and 5 firearms from RODRIGUEZ-CHIRINO and multiple of his SOS by controlled purchases and law enforcement interdictions.

14.    At the conclusion of this T-III intercept, law enforcement concluded that RODRIGUEZ-CHIRINO was conducting narcotics activity and illegal firearm sales throughout the Phoenix area. Additionally, RODRIGUEZ-CHIRINO used licensed commercial truck drivers (REYES) to transport narcotics to the eastern area of the United States. Law enforcement discovered that RODRIGUEZ-CHIRINO was being supplied by multiple individuals in the Phoenix area including MORENO-ARRIETA.

15.    Throughout the course of the T-III wire intercepts, law enforcement purchased multiple firearms and narcotics in the Phoenix and Miami area. Additionally, in corroboration with the T-III wire intercept, law enforcement was able to identify multiple SOS's and distributors in the Phoenix area including ALTAMIRANO-SERRANO, DELTORO-GASTELLUM, COMSTOCK, SANTANA, and SHEA.

16.    After the conclusion of the T-III wire intercept, law enforcement continued to observe the same patterns of activity from the above individuals through multiple sources. These sources included, physical surveillance, pole cameras, PRTT records and recorded conversations between UC and targets.

### b. **ALTAMIRANO-SERRANO**

17.    ALTAMIRANO-SERRANO last entered the United States in 2007. ALTAMIRANO-SERRANO has been granted temporary DACA status until 2022.

18. Throughout the investigation ALTAMIRANO-SERRANO has been identified as one MORENO-ARRIETA's SOS. This has been confirmed from the analysis of PRTT records of MORENO-ARRIETA's known telephone numbers (623-226-9002 and 480-580-9021), which shows the frequency of their communication. Between February 5, 2021, and July 16, 2021, MORENO-ARRIETA and ALTAMIRANO-SERRANO have had 925 total communications. During that time, MORENO-ARRIETA changed his telephone number on two occasions and law enforcement has not been able to identify his new telephone number since September 2021.

19. Law enforcement believes that ALTAMIRANO-SERRANO is a SOS for MORENO-ARRIETA based also on information from the wiretap. For instance, during a monitored phone call on April 8, 2021, between RODRIGUEZ- CHIRINO and MORENO-ARRIETA, in which they discussed the prices of narcotics, MORENO-ARRIETA mentioned he would have to confirm the proposed price (with his source of supply). Approximately two minutes later, MORENO-ARRIETA called ALTAMIRANO-SERRANO. MORENO-ARRIETA did not make any other calls between the time he called RODRIGUEZ-CHIRINO, and the time he called ALTAMIRANO-SERRANO.

20. Additionally, some of the content of ALTAMIRANO-SERRANO and MORENO-ARRIETA's communications are as follows:

21. **May 4, 2021:** At approximately 10:59 p.m., MORENO-ARRIETA placed an outgoing telephone call over the 623-226-9002 to ALTAMIRANO-SERRANO. The two discuss price and quantity of cocaine. The following conversation ensued:

| Representative Sample Call #1519 |
| --- |
| TRANSLATION |
| [Beginning conversation] |

6

SERRANO: What's up, dude?

MORENO: What's up, kid?

SERRANO: Zero, zero [00]. What's up? [Voices overlap]

MORENO: What are you doing? What are you doing?

SERRANO: At work.

MORENO: Uh... Hey?

SERRANO: What's up? [Voices overlap]

MORENO: The, the—what's up with the tire shop?

SERRANO: It's there—[Voices overlap]

MORENO: I need a thirty-three [33] tire, a thirty-three [33] tire.

SERRANO: Well, they're there, dude, but like I told you, like I explained to you yesterday...

MORENO: Well, take it. Well, well, ask for a piece then.

SERRANO: For sure.

MORENO: Yeah—[Voices overlap]

SERRANO: But like I said, I have to get the entire thing. If you're going to commit to take it, I'll get it, but if you're only going to push one [1] or two [2] out, I won't touch it.

MORENO: No, well, on—one [1] or two [2] a day will go. If it's good, that is.

7

SERRANO: For sure—[Voices overlap]

MORENO: Yeah—[Voices overlap]

SERRANO: But are you committing to push it?

MORENO: [U/I]—[Voices overlap]

SERRANO: Do, do you understand what I'm telling you? I just don't want—[Voices overlap]

MORENO: [U/I]—[Voices overlap]

SERRANO: To mess with the dude's whole.

MORENO: Yeah, yeah, yeah, yeah.

SERRANO: Yeah, and like I've already asked for this one—I already asked him for this one and well, I've committed to take this one, the one I got, the one I mentioned to you.

MORENO: Uh-huh.

SERRANO: I committed to it.

MORENO: Okay.

SERRANO: I paid him half [1/2], but I'm going to pay him for the entire thing, because well, what else can one do.

MORENO: Okay. How long does he give you to, to, to, to cover it all?

SERRANO: I asked him for three [3] weeks for this one, dude.

MORENO: For the one that's whole, dude?

8

SERRANO: Yeah, dude, three [3] weeks. I paid him for half [1/2], and on the other half [1/2] he's going to... Because my buddy is going to give me eight-thousand dollars [$8,000] right now.

MORENO: Oh.

SERRANO: And the, the other—I'm going to owe him the other part, and my buddy is going to pay it in those three [3] months, you get me?

MORENO: The half [1/2]?

SERRANO: Uh-huh. Well, it's not a half [1/2], it's less than a half [1/2].

MORENO: I see—[Voices overlap]

SERRANO: It's the, the other shit.

MORENO: Yeah, the white one, right?

SERRANO: Yeah. Yeah.

MORENO: Fuck it, motherfucken ask for it. Uh—[Voices overlap]

SERRANO: Okay.

MORENO: But it's good?

SERRANO: Well, I haven't checked it out, but it must be good. If I ask for it, I ask for it and give you a sample. I'll give you a little sample before I agree to take on the debt.

MORENO: Alright, alright.

9

SERRANO: Okay—[Voices overlap]

MORENO: [U/I]—[Voices overlap]

SERRANO: How much are you going to be able to pay? Are you going to be able to pay around five-hundred [500]? So I can make something.

MORENO: Five-hundred [500]?

SERRANO: Yup.

MORENO: Uh... You won't let it go for four and a half [4-50]?

SERRANO: I'm not making anything, dude.

MORENO: No?

SERRANO: Well, he's giving it to me on credit.

MORENO: Uh-huh.

SERRANO: If I give it to you for five-hundred [500], it's forty [40]...

MORENO: It's just that what I'm getting, dude, five-hundred [500].

SERRANO: Well, let me see what he says. Let me see if he gives it to me on cre—let me see if he gives it to me on credit, and what price he's going to give me, and I'll run my tallies, and if I'll make a profit, then for sure.

MORENO: Alright, then.

SERRANO: Alright, then.

MORENO: Okay—[Voices overlap]

SERRANO: And your money is here, okay? For whenever you want to stop by.

MORENO: Alright, then, I'll let you know in a little bit.

SERRANO: Alright.

MORENO: Alright.

[End of conversation]

22.    Law enforcement believes that, during the preceding conversation, MORENO-ARRIETA and ALTAMIRANO-SERRANO discussed the purchase of a "whole" or "half" a kilogram of cocaine. ALTAMIRANO-SERRANO explains to MORENO-ARRIETA that he has committed to the whole kilogram and does not make a profit on a half. MORENO-ARRIETA confirms that the drugs are cocaine by asking ALTAMIRANO-SERRANO if it is "white."

23.    **May 19, 2021:** At approximately 10:39 p.m., MORENO-ARRIETA received an incoming telephone call from ALTAMIRANO-SERRANO. The two discuss purchasing narcotics.  The following conversation ensued:

| Representative Sample Call #4274 |
| --- |
| TRANSLATION |
| [Beginning conversation] |
| MORENO: What's up, man? |
| SERRANO: What's up, dude? |
| MORENO: [U/I]. |

SERRANO: Could you stop by my mom's house, here?

MORENO: Uh, yeah. But right now...give me like an hour, dude.

SERRANO: Okay. It's just that I've already got the things here. And since I'm making moves myself over here...

MORENO: Oh, you're at the apartments?

SERRANO: No. I'm here at the house. Over here, where I used to live.

MORENO: Oh.

SERRANO: I've already got the things here.

MORENO: Yes.

SERRANO: Since I'm going to pay for them now, no-- I don't want to go again and then come back.

MORENO: Okay.

SERRANO: Um, how long will it take you to get freed up, dude?

MORENO: Let's say in about an hour, dude, so I don't fuck you over.

SERRANO: An hour?

MORENO: Yeah, dude.

SERRANO: Okay. Can you drop by here?

MORENO: Yeah, over there, there's no problem.

> SERRANO: Okay. I'm going to get the--I, I do think I'm going to get the half after all. Might as well go all in.
>
> MORENO: All right, then.
>
> SERRANO: So, so, so, bring the money for your half.
>
> MORENO: Okay, man.
>
> SERRANO: All right, man.
>
> MORENO: So, then, I'll pay for half, and you'll pay for the other half?
>
> SERRANO: Yes.
>
> MORENO: So, it'll come out to how much? 17500-- [Voices overlap]
>
> SERRANO: Seventeen and a half. Half, half of that.
>
> MORENO: All right then. All right, then.
>
> SERRANO: Okay, then.
>
> MORENO: Thank you, dude.
>
> SERRANO: Okay.
>
> MORENO: Bye.
>
> SERRANO: Bye-bye.
>
> [End of conversation]

24.    Law enforcement believes that, during the preceding conversation, MORENO-ARRIETA and ALTAMIRANO-SERRANO discussed the purchase a kilogram of cocaine. ALTAMIRANO-SERRANO tells MORENO-ARRIETA to come to

13

his location and to bring $17,500.00 dollars in currency for his half of the narcotics. ALTAMIRANO-SERRANO explains to MORENO-ARRIETA that he will pay for the other half.

25.     **May 19, 2021:** At approximately 10:58 p.m., MORENO-ARRIETA placed an outgoing telephone call over the 623-226-9002 to ALTAMIRANO-SERRANO. The two discuss price, quantity, and quality of narcotics. The following conversation ensued:

| Representative Sample Call #4402 |
|---|
| TRANSLATION |
| [Beginning conversation] |
| SERRANO:    What's up, dude? Hello? [Voices overlap] |
| MORENO:    What—what's up, dude? |
| SERRANO:    What's up? |
| MORENO:    What did they tell you? |
| SERRANO:    Well, I called my buddy, the, the one whom I sold to... |
| MORENO:    Hm. |
| SERRANO:    And he tells me his buddy has not gotten up yet, to verify how that shit is. |
| MORENO:    Alright. |
| SERRANO:    But I already called my brother and asked, "What do you want us to do?" "We have some there, but they're the same kind," he said. |
| MORENO:    [Mumbles] [U/I]—[Voices overlap] |

14

SERRANO:    Yeah, that it's, that it's really good. That it's been selling. That he he doesn't, he doesn't know why... why it's not—[Voices overlap]

MORENO:    Hm.

SERRANO:    But okay well...

MORENO:    Yeah, because I'd have to take a nine-thousand [9,000] buck loss, dude. It'd be fucked.

SERRANO:    No, well, it's not a problem, dude. Let me tell just tell him so we can return the entire thing. Fucken shit! No fucken reason for me to have taken the other one. I'm, I'm going to—[Voices overlap]

MORENO:    No, I'm telling you [U/I]—[Voices overlap]

SERRANO:    I'm going to have to re—I'm going to have to return the oth—[Voices overlap]

MORENO:    I'm not trying to—you know? [Voices overlap]

SERRANO:    I'm going to have to return the, the piece—mine, I mean, and it already sold. That's where the issue lies, that I'm not returning the whole thing.

MORENO:    Fuck.

SERRANO:    It's fucked.

MORENO:    [Sighs] Yeah, dude. No, well, it's a tough spot. And, and I took it to another dude thinking he would not be familiar with it, but he said the same bullshit, that it tastes like seafood.

SERRANO:    He tasted it, or what the fuck? He ate it or what?

15

MORENO:    No, no, but I mean, it has a scent to it. He said it smells and I don't know what the fuck. "No, well, to be honest, I don't know," I told him. But... [Pause]

SERRANO:    [Mumbles] Oh. No, well, it's not a problem. If not—[Voices overlap]

MORENO:    [Sighs]—[Voices overlap]

SERRANO:    If not, then I'll have to return it—[Voices overlap]

MORENO:    It's just, it's just the three [3] pieces that, that he would take, remember?

SERRANO:    Yeah—[Voices overlap]

MORENO:    That was what was taken.

SERRANO:    [U/I]—[Voices overlap]

MORENO:    If you want, we can give him the profit made, too; that's no problem—[Voices overlap]

SERRANO:    It, it did sell?

MORENO:    Huh?

SERRANO:    You did sell it after all?

MORENO:    The three [3] pieces?

SERRANO:    Yeah.

MORENO:    Yeah, dude, but it was fucked anyway. I mean, the dude told me that it wasn't, it wasn't good.

SERRANO:    But he did take them?

MORENO:    Yeah, he took two [2] pieces, because one [1] piece he re—he returned. But he said it wasn't worth shit. [Pause]

SERRANO:    If we return it, this dumbass is going to want the entire thing. Or, I don't know. Let me see what happens. Fucken shit. We shouldn't have messed with it without first getting a sample, right?

MORENO:    Yeah, this is fucked. Yeah, it's a tough spot without getting a sample first; at least a gram or something, right? [Voices overlap]

SERRANO:    Yeah, you could have taken a sample instead and—[Voices overlap]

MORENO:    Yeah—[Voices overlap]

SERRANO:    Then you could confirm, right?

MORENO:    Yeah, yeah. Yeah, it's fucked. Yeah, so I'd be returning what? Nineteen [19] pieces, right? Yeah, it's nineteen [19] pieces.

SERRANO:    Uh-huh.

MORENO:    I'll bring it over shortly. Should I bring the "calculator?"

SERRANO:    You can't, you can't, you can't bring all of it? All of it, because they're going to want all of it, dude.

MORENO:    Okay, let me call that dude and see how much he has left.

SERRANO:    Yeah, and I'm going to ask my buddy for the other one, and have him get it from his buddy and see what happens. I'm going to have to return the whole thing. Fuck.

17

| | |
|---|---|
| MORENO: | Alright, then. |
| SERRANO: | Alright. |
| MORENO: | Alright. |
| | [End of conversation] |

26.    Law enforcement believes that, during the preceding conversation, MORENO-ARRIETA and ALTAMIRANO-SERRANO are upset at the quality of narcotics they obtained and sold. ARRIETA-MORANO complains that they should have obtained a sample first when he stated "yeah, this is fucked. Yeah, it's a tough spot without getting a sample first; at least a gram or something, right? [Voices overlap]."

**c.    Apprehension of SUBJECT CELLULAR TELEPHONE**

27.    On November 30, 2021, the Honorable John Z. Boyle, U.S. District Court of Arizona, authorized the search of ALTAMIRANO-SERRANO' residence.  The search warrant for ALTAMIRANO-SERRANO's residence authorized the seizure and search of any cellular telephones located in ALTAMIRANO-SERRANO's residence, but the warrant did not include cellular telephones found in ALTAMIRANO-SERRANO's possession outside of his residence.

28.    On December 2, 2021, law enforcement conducted a traffic stop on ALTAMIRANO-SERRANO to request access to the residence prior to execution of the search warrant.

29.    During the traffic stop, law enforcement removed ALTAMIRANO-SERRANO's phone from his person. Subsequently, law enforcement requested ALTAMIRANO-SERRANO for his telephone number. ALTAMIRANO-SERRANO provide law enforcement with his telephone (480-572-5020), which is the same number captured during the T-III wire intercept. Additionally, law enforcement placed a telephone call to the telephone number provided by ALTAMIRANO-SERRANO to confirm the

18

number provided. Law enforcement observed their telephone number displayed on ALTAMIRAO-SERRANO's telephone. Shortly after, law enforcement requested consent to search the telephone, to which ALTAMIRANO-SERRANO replied, "My phone?... I have nothing to hide but no".

30.    The SUBJECT CELLULAR TELEPHONE is currently in storage at ATF evidence vault located at 40 N Central Avenue, Phoenix, AZ 85004.  In my training and experience, I know that the SUBJECT CELLULAR TELEPHONE has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT CELLULAR TELEPHONE first came into the possession of the ATF.

## III.    ITEMS TO BE SEIZED

31.    Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found in the contents of the SUBJECT CELLULAR TELEPHONE.

32.    Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

a.    Drug traffickers often keep large amounts of United States currency on hand in order to maintain and finance their ongoing trafficking activities.  Traffickers commonly maintain such currency where they have ready access to it, such as in their homes and vehicles. It is also common for traffickers to possess drug proceeds and items purchased with proceeds in their homes and vehicles. Thus, it is common for currency, expensive jewelry, precious metals, or financial instruments to be found in the possession of drug traffickers.

b.    Drug traffickers commonly use cellular telephones to communicate with other drug traffickers and customers about drug-related activities through the use of

19

telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, drug traffickers commonly use other capabilities of cellular telephones to further their drug trafficking and money laundering activities. Therefore, evidence related to drug trafficking activity and money laundering activity is likely to be found on the SUBJECT CELLULAR TELEPHONE.

33.   In addition to items which may constitute evidence and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the SUBJECT CELLULAR TELEPHONE.

IV.   **DIGITAL EVIDENCE STORED WITHIN A CELLULAR TELEPHONE**

34.   As described in Attachment B, this application seeks permission to search for records and information that might be found in the contents of the SUBJECT CELLULAR TELEPHONE. Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

35.   *Probable cause.* Your Affiant submits that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on the SUBJECT CELLULAR TELEPHONE for at least the following reasons:

a.   Your Affiant knows that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The cellular telephone is an instrumentality of the crime because it is used as a means of committing the criminal offense. The cellular telephone is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that a cellular telephone used to commit a crime of this type may contain: data that is evidence of how the cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was

20

achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b.　Based on my knowledge, training, and experience, your Affiant knows that cellular telephones contain electronically stored data, including, but not limited to, records related to communications made to or from the cellular telephone, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

c.　Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone, deleted, or viewed via the Internet. Electronic files downloaded to a cellular telephone can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone until it is overwritten by new data.

d.　Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the cellular telephone that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

36.　*Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of

21

the crimes described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be found in the contents of the SUBJECT CELLULAR TELEPHONE because:

a.    Data in a cellular telephone can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.    As explained herein, information stored within a cellular telephone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone was remotely accessed, thus inculpating or exculpating the owner.  Further, activity on a cellular telephone can indicate how and when the cellular telephone was accessed or used.  For example, as described herein, cellular telephones can contain information that log: session times and durations, activity associated with user accounts, electronic storage media that connected with the cellular telephone, and the IP addresses through which the cellular telephone accessed networks and the internet.  Such information allows investigators to understand the chronological context of cellular telephone access, use, and events relating

to the crime under investigation. Additionally, some information stored within a cellular telephone may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The geographic and timeline information described herein may either inculpate or exculpate the user of the cellular telephone. Last, information stored within a cellular telephone may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cellular telephone was used, the purpose of its use, who used it, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a cellular telephone that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, cellular telephone evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one cellular telephone is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

23

e.      Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

37.      *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit imaging or otherwise copying the contents of the SUBJECT CELLULAR TELEPHONE, including the use of computer-assisted scans.

38.      *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

V.      **CONCLUSION**

39.      Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence and/or instrumentalities of violations of 21 U.S.C. § 846, Conspiracy to Possess with Intent to Distribute a Controlled Substance, 21 U.S.C. § 841, Possession with Intent to Distribute a Controlled Substance, 18 U.S.C. § 924(c), Possession of a Firearm in Furtherance of a Drug Trafficking Offense, and 18 U.S.C. § 1956(a)(1), Money Laundering are likely to be found in the contents of the SUBJECT CELLULAR TELEPHONE further described in Attachment A.

Special Agent Daniel Kolodziej

24

Subscribed and sworn telephonically on this ___16___ day of _December_, 2021.

_____
HONORABLE MICHELLE H. BURNS
United States Magistrate Judge

25